1  DAVID MEEGAN (State Bar No. 114549)
   ANTHONY ASEBEDO (State Bar No. 155105)
2  **MEEGAN, HANSCHU & KASSENBROCK**
   Attorneys at Law
3  11341 Gold Express Drive, Suite 110
   Gold River, CA  95670
4  Telephone:  (916) 925-1800
   Facsimile:  (916) 925-1265
5
   Attorneys for the Debtor
6

7                 UNITED STATES BANKRUPTCY COURT

8                 EASTERN DISTRICT OF CALIFORNIA

9                      [Sacramento Division]

10

11  In re:                              Case No. 14-26351-C-11
                                        Docket Control No. MHK-14
12
   CALIFORNIA COMMUNITY
13  COLLABORATIVE, INC.,

14
                          Debtor.       Hon. Christopher M. Klein
15

16      **FOURTH AMENDED DISCLOSURE STATEMENT IN SUPPORT OF**
       **DEBTOR'S AMENDED PLAN OF REORGANIZATION DATED MARCH 26, 2015**
17
                          **I. INTRODUCTION**
18

19          This is the fourth amended disclosure statement ("Disclosure Statement") in the
   above-captioned chapter 11 case (the "Case") of California Community Collaborative,
20  Inc. (the "Debtor"), which filed its voluntary petition under chapter 11 of the United
   States Bankruptcy Code ("Code") on June 17, 2014 (the "Petition Date").  This
21  Disclosure Statement contains information about the Debtor and describes the Debtor's
22  Amended Plan of Reorganization Dated March 26, 2015 (the "Plan").

23          *Your rights may be affected. You should read the Plan and this Disclosure*
   *Statement carefully and discuss them with your attorney. If you do not have an*
24  *attorney, you may wish to consult one.*

25          The proposed distributions under the Plan are discussed in Section III of this
26  Disclosure Statement.  Claims of general unsecured creditors are classified in Class 4,
   and are to receive a distribution of 100% of their allowed claims, with interest, to be
27  distributed through twice-annual disbursements over a period of no more than
   approximately thirty-six months.
28

**A.      Purpose of This Document.**

This Disclosure Statement describes:

♦      The Debtor, its business, and significant events during the bankruptcy case;
♦      How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you are to receive on your claim or equity interest if the Plan is confirmed);
♦      Who can vote on or object to the Plan;
♦      What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
♦      Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
♦      The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

**B.      Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures for confirmation of the Plan.

        *1.      Time and Place of the Hearing to Confirm the Plan.*

The hearing at which the Court will determine whether to confirm the Plan will take place in Courtroom 35, Robert T. Matsui United States Courthouse, 501 "I" Street, Sixth Floor, Sacramento, California 95814.  The date and time for this hearing is set forth in the Order Approving Disclosure Statement And Fixing Time for Filing Acceptances or Rejections of Plan, Combined With Notice Thereof (the "Order & Notice"), and may be continued from time to time.

        *2.      Voting to Accept or Reject the Plan.*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot:

            By mail to:
            Anthony Asebedo
            Meegan, Hanschu & Kassenbrock
            11341 Gold Express Drive, Suite 110
            Gold River, CA 95670;

/ / /

Or, by fax to:
Anthony Asebedo
Meegan, Hanschu & Kassenbrock
fax no.: (916) 925-1265.

See section VI.A. below for a discussion of voting eligibility requirements. **Your ballot must be *received* by the deadline stated in the ballot, or it will not be counted.**

> 3.    *Deadline For Objecting to Confirmation of the Plan.*

Objections to the confirmation of the Plan must be filed with the Court, and served on the following, **no later than the last date for same stated in the Order & Notice:**

Anthony Asebedo
Meegan, Hanschu & Kassenbrock
11341 Gold Express Drive, Suite 110
Gold River, CA 95670; and

Office of the United States Trustee
501 "I" Street, Suite 7-500
Sacramento, CA 95814.

> 4.    *Identity of Person to Contact for More Information.*

If you want additional information about the Plan, you may contact attorney Anthony Asebedo, at the law offices of Meegan Hanschu & Kassenbrock, 11341 Gold Express Drive, Suite 110, Gold River, CA 95670 (phone 916-925-1800; fax 916-925-1265).

**C.    Disclaimer.**

***The Court has approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.***

The Debtor has prepared this Disclosure Statement to disclose information which it deems material and necessary to evaluation of the Plan.  The material in this Disclosure Statement is intended solely for that purpose and solely for the use of known creditors of the Debtor.  Accordingly, you should not rely on this Disclosure Statement for any purpose other than in making a decision on how to vote on the Plan.
/ / /

aa:\mhk-14 disclosure statement_a4 0326

## II. BACKGROUND

### A.    Description and History of the Debtor and Its Business.

The Debtor is a closely-held California corporation that was formed in 1999. Merrell Schexnydre, the Debtor's president, is the sole shareholder in and incorporator of the Debtor.  Since its formation, the Debtor has elected to be treated as an S-corporation under federal tax laws, so as to pass corporate income, losses, deductions, and credits through to its shareholder for federal tax purposes.

The Debtor is in the business of owning and renting to non-residential tenants an office building located at 655 West 2nd Street, San Bernardino, California (the "Real Property").  The Debtor acquired the Real Property shortly after the Debtor's formation, when the Real Property consisted of a vacant former "Mervyn's" retail shopping facility. The Debtor remodeled the building on the Real Property into the two-story, 88,000 square-foot (approx. gross) office building which is now operating there.  The Debtor effected the remodel according to the requirements of its initial tenant, the California Department of Transportation ("CalTrans").

In 2000, CalTrans occupied almost all of the rentable space in the building under a ten-year lease with the Debtor.  As the end of the lease term approached, in 2008, CalTrans indicated to the Debtor that state budget restrictions required it to reduce overhead and operations, and under a new four-year lease with the Debtor, CalTrans reduced its occupancy to only about 58,000 square feet, approximately 68% of the available space at the Real Property.

In 2008, the Debtor was able to regain a portion of the loss in rental income from CalTrans, by obtaining a lease with the Judicial Council of California (the "Council"), for about 26,000 square feet of space previously rented to CalTrans.  The terms of the leases with the Council and with CalTrans made it possible for the Debtor to refinance the existing loan on the building, by way of a 2008 loan from Vineyard Bank of Anaheim, California.  The loan from Vineyard Bank, in the original principal amount of $9,238,000, initially bore interest at six percent (6%) per year and was due and payable in September 2013.  The Debtor used loan proceeds to pay off existing loans and encumbrances of approximately $6,500,000 and to pay for tenant improvements on the Real Property totaling approximately $2,800,000.

### B.    Events Leading to This Chapter 11 Case.

By 2012, CalTrans was experiencing further cutbacks in funding, as state tax revenues remained low due to the effects of the nationwide financial crisis of 2007-2008.  As a consequence, CalTrans, which by then was renting space on only a month-to-month basis, vacated all of the space it was leasing, leaving the Debtor with a significant vacancy rate and rental income that fell far short of projections and the amount necessary to support monthly payments to California Bank & Trust ("CB&T"), which in 2009 had become the successor in interest to Vineyard Bank.

Given the significant vacancy rate, the Debtor worked hard to obtain a new lease or leases for the space once leased by CalTrans. But by the September 2013 due-date on the loan documents with CB&T, the Debtor's efforts remained unsuccessful. In October 2013, CB&T and the Debtor entered a forbearance agreement under which CB&T agreed to forbear from enforcing all terms of the loan and deed of trust, and under which the interest payable on the unpaid principal amount due to the Bank increased to 7.5% per year through December 2013, at which time the interest rate increased again, to 12.5% per year.

By the end of 2013, the Debtor was negotiating with the Consulate of Mexico ("Consulate") for a lease of the bulk of the vacant space at the Real Property. Although negotiations were progressing, by December 5, 2013, when the term of CB&T's forbearance was to end, the Debtor had not yet reached terms with the Consulate, and the Debtor was thus unable to obtain financing to pay CB&T the amount due under the loan and related forbearance agreement.

In January 2014, the Debtor had discussions with CB&T seeking an extension of the forbearance period to accommodate the Debtor's continuing negotiations with the Consulate. The Debtor believed that CB&T was amenable to an extension based on prompt payment of $36,000.00 to CB&T, but after a check in that amount was sent to CB&T, and cashed, the amount was later refunded along with a demand for full payment of the amount due under the loan documents. Thereafter, the Debtor continued to negotiate with the Consulate for lease terms at the Real Property.

On June 2, 2014, CB&T initiated an action for judicial foreclosure of the Real Property, in the San Bernardino County Superior Court. CB&T's complaint named the Debtor and Mr. Schexnydre, who had guaranteed the Debtor's obligations under the loan documents, as defendants.

In its judicial foreclosure action, CB&T scheduled a hearing on the appointment of a receiver for the Real Property, to be held on June 18, 2014. The Debtor, which had come closer to reaching terms with the Consulate for a lease, filed its voluntary chapter 11 petition on June 17, 2014, thereby staying the judicial foreclosure action as to the Debtor. Since that time, CB&T has continued to seek a monetary judgment against Mr. Schexnydre in the action on the guaranty.

## C.    Significant Events During the Bankruptcy Case.

During the course of the chapter 11 case, the Debtor has obtained a series of orders that authorized it to use rents collected from the Real Property to pay designated expenses and also to make various payments to CB&T and to the San Bernardino Tax Collector. These payments are intended as a form of adequate protection for each creditor's security interest in the Real Property, as contemplated by 11 U.S.C. § 361. The latest such order authorizes the use of cash collateral through December 31, 2015.

/ / /

Early in the chapter 11 case, the Office of the United States Trustee conducted the Initial Debtor Interview. The Court also conducted the initial Preliminary Status Conference for the Debtor's chapter 11 case, and the Meeting of Creditors in the Debtor's chapter 11 case was conducted and concluded.

In July 2014, the Court entered an order that authorized the Debtor to employ Meegan, Hanschu & Kassenbrock as its counsel in regard to the Case. In August 2014, the Court entered an order that authorized the Debtor to employ CBRE - Inland Commercial Real Estate ("CBRE") as its broker for leasing space at the Real Property. CBRE had been handling negotiations for lease of the Real Property under a pre-petition exclusive listing agreement.

After the Petition Date, CBRE continued to pursue efforts to lease vacant space at the Real Property, specifically to the Consulate. Although in July 2014 the Debtor reached terms with the Consulate for the lease of approximately 22,000 square feet of space at the Real Property, the Consulate ultimately failed to execute the written lease that had been prepared and tendered for signature. This failure by the Consulate caused the Debtor in January 2015 to withdraw consideration of its Plan of Reorganization Dated September 12, 2014 and the Amended Disclosure Statement that was on file at that time, as that plan was predicated on consummation of a lease with the Consulate.

In January 2015, CB&T filed a Motion for Relief From the Automatic Stay, which requested that the Court authorize it to pursue its rights against the Real Property notwithstanding the pending chapter 11 case. The Debtor opposed CB&T's motion, and the hearing on the motion has been continued a number of times. CB&T obtained, however, limited interim relief from the automatic stay to move forward with its state-court action, but not specifically to complete foreclosure or a trustee's sale of the Real Property.

In early 2015, the Debtor and CBRE worked aggressively to obtain additional tenants at the Real Property. In January 2015, the Debtor submitted bids to the County of San Bernardino (the "County") for the lease of a significant amount of space, and in March 2015, the Debtor succeeded in obtaining execution of a ten-year lease for approximately 39,000 square feet of space at the Real Property, to the Rex and Margaret Fortune School of Education ("Fortune"). On May 11, 2015, the Court entered an order that authorized the Debtor to enter into the lease with Fortune, and entered another order, which was later amended at the Debtor's request, authorizing the Debtor to borrow as much as $2,200,000 for the purpose of funding a $1,775,000 tenant-improvement allowance under the lease and for funding the Debtor's operations before Fortune takes possession of the leased premises.

The Court's approval of the financing, which is to be provided by Triwest Financial Group, Inc. ("Triwest"), was made subject to specific conditions including that the City of San Bernardino ("City") approve the conditional-use permit ("CUP") that is necessary for Fortune's use of the leased property as an educational facility, and also

that the Debtor and Triwest deliver to the Bank documents reasonably necessary to effect the subordination of the security interest of the lender to the Bank. On September 16, 2015 the CUP was approved, and the Debtor has satisfied the other conditions set forth in the court's amended order approving the financing. Fortune has, with the cooperation and assistance of the Debtor, completed the engineering and design work for the necessary tenant improvements at the Real Property, and construction of the improvements has progressed on schedule for a December 2015 occupancy by Fortune.

As of the date of this Disclosure Statement, Triwest has commenced advances to the Debtor under the court-approved loan, and the Debtor anticipates that Fortune will pay its first full month's rent in January 2016. At that time, only about 22,000 square feet of space will remain to be leased. The Debtor will continue to pursue a lease or leases with the County for the remaining vacant space, based on bids it submitted in early 2015.

In May 2015, the Debtor was informed by the Council that it would seek to obtain an extension of its lease for space at the Real Property, currently to end in 2018, for as much as ten years. After a short period of negotiations, the Debtor obtained terms with the Council for a ten-year lease extension with a modestly lower monthly base rental rate. The Debtor recently executed the First Amendment to Lease Agreement, which provides for an extended lease term up to September 30, 2025, with a provision giving the Council rights to terminate the lease in 2020 or 2022 with prior notice to the Debtor. By insuring the Council's continued long-term tenancy, this extension enhances the value of the Real Property further. According to an analysis obtained by the Debtor that was performed by CBRE in May 2015, a ten-year extension of the Council lease results in an increased valuation for the Real Property, up to approximately $16,000,000.

**D.    CB&T's "Over-Secured" Claim.**

CB&T filed a timely Proof of Claim in the Debtor's case disclosing a fully secured claim in the amount of $9,526,764.57 as of the Petition Date. CB&T asserts that as of November 4, 2015, the Debtor's obligation had increased to the total amount of $10,661,608.08. The larger figure takes into account the amount of the Debtor's post-petition adequate-protection payments to CB&T through October 2015 and includes default-rate interest that totals about $829,800 and attorneys' fees and related costs totaling about $216,900. Because the Bank's claim is less than the value of the Real Property and property taxes due (i.e. it is an "over-secured" claim), the Debtor agrees that CB&T's claim will be allowed in the amount asserted by the Bank as of November 4, 2015, to be adjusted appropriately to include additional contract interest and charges properly accruing up to confirmation of the Plan, and that the treatment currently stated in the Plan for CB&T's Class 2.2 allowed secured claim will be modified accordingly.

/ / /

**E.    Projected Recovery of Avoidable Transfers.**

In general, the Code gives trustees and chapter 11 debtors in possession specific powers to avoid certain pre-bankruptcy transactions, such as so-called preference payments to creditors (generally, within ninety days before the bankruptcy filing as to non-insiders, and one year as to insiders) and fraudulent conveyances of property (to any party within two years before the bankruptcy filing).  According to disclosures in the Statement of Financial Affairs filed by the Debtor in the chapter 11 case, it made a number of payments to or for the benefit of Mr. Schexnydre, as the Debtor's president, during the year before the Petition Date, and that he advanced funds to the Debtor on a number of occasions during the same period.  In addition, there were a number of payments made to creditors during the ninety days before the Petition Date.  A list of such payments to creditors is submitted herewith as Exhibit "A."  A list of payments made to and advances made by Mr. Schexnydre is submitted herewith as Exhibit "B."

The Debtor's analysis of the payments set forth in Exhibits "A" and "B" indicates that such payments are likely not recoverable, primarily because they were either made in the ordinary course as to creditors, and as to Mr. Schexnydre, as reimbursement for business expenses or for compensation for management services rendered.  The Debtor believes that there were no pre-bankruptcy sales or other transfers of property that would be considered fraudulent or otherwise avoidable.  Nonetheless, the Plan reserves rights to avoid all such transfers post-confirmation.  Funds recovered from avoided transfers, if any, would be subject to distribution under the Plan.

**F.    Current and Historical Financial Conditions.**

The Debtor's major asset of value is the Real Property.  Other than the Real Property, the Debtor has only assets of minor value, such as office supplies, equipment, and cleaning supplies that are valued at about $1,500.  On its bankruptcy schedules, the Debtor also identified an account receivable for rent from its then-only tenant, the Council, based on rents payable for the month of the bankruptcy filing.  Such rents were paid, and the Council has remained current on rent payments since the Petition Date.

As of the Petition Date, the Debtor valued the Real Property at $12,000,000.  Given the fact that the Debtor was confident at that time that it would be approaching full occupancy for the Real Property by way of a lease with the Consulate, it calculated the value as the mid-point between the as-is value (with only the existing occupancy rate) and full occupancy.  By contrast, in connection with its motion for relief from the automatic stay, CB&T offered an appraisal of the Real Property that estimated the value of the Real Property to be only $7,530,000, "as-is."  The Debtor disputed that valuation, but did not offer its own appraisal in support of its position as to value.

With the execution of the lease with Fortune, the Debtor believes that the value of the Real Property is now approximately $15,000,000 to $16,000,000.  For
/ / /

aa:\mhk-14 disclosure statement_a4 0326

reference, the identity and fair market value of the bankruptcy estate's assets, including the Real Property, are listed in Exhibit "C" to this Disclosure Statement.

The Debtor did not have audited or reliable cash flow statements or balance sheets prepared as of the Petition Date.  However, the current financial status of the Debtor is reflected in the most recent post-petition Monthly Operating Report filed since the commencement of the Case, which is set forth in Exhibit "D" to this Disclosure Statement (less attachments including bank statements and check register).

## III.  SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A.    What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims is impaired or unimpaired.  If the Plan is confirmed, the recovery on your claim will be limited to the amount provided by the Plan.

### B.    Unclassified Claims.

Certain types of claims are entitled to specific treatment under the Code. These are unclassified claims.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Debtor has *not* placed the following claims in any class:

#### 1.    Administrative Expense Claims.

Administrative Expenses Claims are costs or expenses of administering the Case which are allowed under § 503 of the Code, with priority under 507(a)(2) of the Code. Administrative expenses include court-approved professional fees and the value of any goods sold to the Debtors in the ordinary course of business and received within twenty (20) days before the date of the bankruptcy petition.  The Code requires that all administrative expenses that have been allowed by the Court after hearing are to be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.  Should any holder of an Administrative Expense Claim agree to payment after the Effective Date, the unpaid amount of such claim shall accrue and be paid interest at the rate of 5% per year after the Effective Date or after approval by the Court, whichever is later.

The Debtor estimates that Administrative Expenses as of the Effective Date of the Plan will likely consist of the following amounts payable to professionals (all amounts are approximate): (i) attorneys' fees and costs payable to the Debtor's bankruptcy counsel in the amount of approximately $60,000.00 (after payment from

the $27,537 balance remaining of a pre-petition retainer); and (ii) U.S. Trustee's fees of $1,625.00 (current quarter).  To the extent CBRE as the Debtor's leasing agent becomes entitled to court-approved commissions on account of the new lease with Fortune, CBRE will be paid at least in part from tenant-improvement financing.

The Plan includes a deadline for the filing of motions for allowed Administrative Expense Claims.  Compensation to professionals will not be payable until after Court approval of same has been requested and obtained, after notice and hearing.  U.S. Trustee's fees will be payable during the quarter following confirmation.  As such, the Debtor does not anticipate that any significant amount of Administrative Expenses will be payable on the Effective Date, but only following the Effective Date, once the Court approves professional compensation and as U.S. Trustee's fees become payable post-confirmation, until the closing of the Case.

        2.    *Priority Tax Claims.*

Priority tax claims are for certain unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Under the Code, unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding five (5) years from the Petition Date.  The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name & type of tax) | Estimated Amount of Claim | Date(s) of Assessment | Treatment |
|---|---|---|---|
| IRS  California Franchise Tax Board | $100. Proof of claim no. 9, as amended  $1,600. Proof of claim no. 5. | 10/5/15  12/31/2013; 12/31/2014 | Priority Tax Claims will be paid in full, no later than one (1) year from the Effective Date.  Priority Tax Claims shall accrue interest after the Petition Date at the statutory rate of interest until paid in full. |

**C.    Classes of Claims.**

The following is a summary of the classes set forth in the Plan and the treatment thereof:

        1.    *Class 1: Priority Non-Tax Unsecured Claims.*

Priority claims that are referred to in § 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes.  These claims consists generally of priority non-tax claims.  The Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.  The following / / /

chart lists all classes containing claims under § 507(a)(1), (4), (5), (6), and (7) of the Code and their proposed treatment under the Plan:

| Class No. | Description | Impair-ment | Treatment |
|---|---|---|---|
| 1 | Priority unsecured claims under § 507(a)(1), (4), (5), (6), and (7).<br><br>There are no such claims known. Est. total amt. of these claims: $0 | Unimpaired | Class 1 claims, if any, are unimpaired and shall be paid in full with applicable post-petition interest, on or before the Effective Date. |

**2.    *Class 2: Secured Claims.***

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.  If the value of the collateral (or set offs) securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.  Any claim for unpaid taxes secured by real property also entitled to priority under § 507(a)(8) of the Code is afforded treatment as a secured claim, as required by § 1129(a)(9)(D) of the Code.

After confirmation of the Plan, the Debtor shall continue to have rights and authority to seek determination of the secured status of any claim pursuant to § 506 of the Code, although the Debtor in this case does not believe that any such determination will be necessary.  In the event the Debtor and any creditor cannot agree upon the portion of the creditor's claim that is secured, the Court shall have jurisdiction post confirmation to determine same.

/ / /

| Class No. | Description | Insider? (Yes or No) | Impair-ment | Treatment |
|---|---|---|---|---|
| 2.1 | *Claimant name:* San Bernardino County Tax Collector<br><br>*Collateral description:* the Real Property.<br><br>*Allowed Secured Amount:* $168,179.03 plus post-petition statutory interest; funds paid by Debtor post-petition held in trust<br><br>*Lien:* First priority tax. | No | Impaired | The Class 2.1 Allowed Secured Claim shall be allowed as set forth in the County's Proof of Claim No. 10 filed September 15, 2014, and shall be paid in full with penalties, costs, fees, and interest to accrue at the statutory rate in accordance with the payment schedule calling for equal annual installments of $41,168.34, as set forth in Exhibit 1 to the Plan.  Confirmation of the Plan shall not impair or otherwise affect the Class 2.1 claim holder's security interest in property of the Debtor.  In addition, the Debtor shall timely pay ongoing post-confirmation taxes, estimated to be in the amount of $61,161.97 for fiscal year 7/1/2015 to 6/30/2016.  Should the Debtor sell or refinance the Real Property before the last installment is due to the Class 2.1 claimant, the Debtor shall pay from escrow the full amount of the Class 2.1 Allowed Secured Claim with interest accrued to the date of full payment. |

| Class No. | Description | Insider? (Yes or No) | Impair- ment | Treatment |
|---|---|---|---|---|
| 2.2 | *Claimant name:* California Bank & Trust<br><br>*Collateral description:* first deed of trust against the Real Property.<br><br>*Allowed Secured Amount::* $10,661,608.08 (as of Nov. 4, 2015).<br><br>*Lien:* First deed of trust.<br><br>*Note:* Obligation guaranteed by Merrell Schexnydre, the Debtor's president. | No | Impaired | The Class 2.2 Allowed Secured Claim shall be allowed in the amount of $10,661,668.08 together with (i) interest accruing thereafter from November 4, 2015 and (ii) attorneys' fees and costs incurred on or after November 1, 2015 as permitted in the loan documents between the Class 2.2 claimant and the Debtor in effect as of the Petition Date.  The claim shall bear interest at the rate of 5.5% per year from the Confirmation Date.  After the Confirmation Date, the Debtor shall continue to make the monthly adequate-protection payments to the Class 2.2 claimant in the amount authorized by the Court as of the Confirmation Date; then, beginning July 15, 2015 and continuing the fifteenth day of each month thereafter until the Class 2.2 Allowed Secured Claim is paid in full, the Debtor shall instead pay the Class 2.2 claimant the amount of $45,000.00 per month, which shall be applied to interest on the Class 2.2 Allowed Secured Claim.  The Debtor shall pay the Class 2.2 Allowed Secured Claim in full, with interest, no later than January 30, 2017.  Notwithstanding the foregoing, the Debtor may, before January 30, 2017, make a lump-sum payment from escrow for sale or refinancing of the Real Property that by agreement with the Class 2.2 claim holder is in full satisfaction of the Class 2.2 Allowed Secured Claim. Confirmation of the Plan shall be deemed to rescind any Notice of Default recorded against the Debtor's real property before the Petition Date. Confirmation of the Plan, however, shall not otherwise impair the Class 2.2 claimant's security interest in property of the Debtor and shall not affect or diminish any of the Debtor's non-monetary covenants and obligations owed under the applicable pre-petition loan and security documents. |

/ / /

3.    *Class 3:  Claims Based on Executory Contracts and Leases.*

These are allowed claims based on executory contracts and leases between the Debtors and third parties.  The effect of assumption and rejection of such contracts and leases is described in detail in paragraph "F" below.

| Class No. | Description | Insider? (Yes or No) | Impair-ment | Treatment |
|---|---|---|---|---|
| 3.1 | *Claimant name:*  Judicial Council of California.<br><br>*Contract/Lease:*  Lease Agreement dated April 9, 2007.<br><br>*Pre-Petition Default(s):*  none. | No | Un-impaired | As of the Confirmation Date, the Lease with the Class 3.1 claimant shall be deemed assumed, and the claim shall be unimpaired. |
| 3.2 | *Claimant name:*  Amtech Elevator Services.<br><br>*Contract/Lease:*  Master Maintenance Agreement dated July 3, 2013.<br><br>*Pre-Petition Default(s):*  $2,000 missed payment amount)]. | No | Impaired | As of the Confirmation Date, the contract with the Class 3.2 claimant shall be deemed assumed.  The Debtor shall, within six months of the Effective Date, cure all monetary and other defaults under the Lease existing as of the Petition Date. Upon confirmation of the Plan, the Class 3.2 claimant shall be enjoined from taking any activity to cancel, terminate, or otherwise enforce remedies under the executory contract based on a default that existed as of the date of the Petition Date, and such injunction shall terminate the date that is six months from the Effective Date. |
| 3.3 | *Claimant name:*  All American Alliance Guard Servs., Inc.<br><br>*Contract/Lease:*  Contract starting 11/7/13<br><br>*Pre-Petition Default(s):*  None | No. | Un-impaired | As of the Confirmation Date, the contract with the Class 3.3 claimant shall be deemed assumed, and the claim shall be unimpaired. |

| Class No. | Description | Insider? (Yes or No) | Impair-ment | Treatment |
|---|---|---|---|---|
| 3.4 | *Claimant name:* Kaiser Foundation Health Plan, Inc.<br><br>*Contract/Lease:* Group Agreement<br><br>*Pre-Petition Default(s):* Approx. $3,826 | No | Impaired | As of the Confirmation Date, the Insurance Contract shall be deemed rejected. |

    4.    *Class 4:  General Unsecured Claims.*

        These are claims that are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

| Class No. | Description | Impair-ment | Treatment |
|---|---|---|---|
| 4 | These are the allowed claims of general unsecured creditors, any allowed secured claim that as a result of a valuation of the secured claimant's collateral the claim is unsecured in whole or in part pursuant to the terms of this Plan, and allowed claims that result from rejection of a lease or executory contract. This class includes any and all claims which are not more particularly described in Class 1, Class 2.1, Class 2.2, Class 3.1, Class 3.2, Class 3.3, Class 3.4, and Class 5.<br><br>Total principal amount: approx. $569,100 (based on scheduled claims and proofs of claim filed to date). | Impaired | Beginning after the full payment of all Administrative Expense Claims (except such claims being paid as otherwise agreed by the claimant), Priority Tax Claims, and Class 1 Claims, the Debtor shall, on June 30 and on December 31 each year, distribute no less than the aggregate amount of $15,600.00 from the Creditor Account, pro rata, to the holders of Class 4 Allowed Claims.  The Debtor shall continue to make such twice-yearly pro rata disbursements to holders of Allowed Class 4 Claims until such time as the Class 4 Allowed Claims are paid in full, with simple interest at the rate of 3% per year from the Effective Date.  Class 4 Allowed Claims shall be paid in full with such interest no later than three (3) years from the Effective Date, the final pro-rata disbursement being in an amount sufficient to pay such claims in full. |

    5.    *Class 5       Merrell Schexnydre as Shareholder.*

| Class No. | Description | Impair-ment | Treatment |
|---|---|---|---|
| 5 | Equity interest holder:  Merrell Schexnydre | Unimpaired | Class 5 equity security holder will retain his interest in the Debtor as same existed immediately prior to the Petition Date. |

**D.    Means of Implementing the Plan.**

    *1.    Source of Distributions to Claim Holders.*

The filing of the Debtor's chapter 11 petition created a bankruptcy estate (the "Estate"), which will continue to exist until confirmation of the Plan. The Estate consists of all property of the Debtor as of the Petition Date, the primary such property being the Real Property. The rents collected by the Debtor, and proceeds of financing secured by the Real Property, if any, after the Petition Date and until confirmation of the Plan are also property of the Estate. The Plan provides that the Debtor will deposit post-confirmation rents and any proceeds of refinancing secured by the Real Property into a specific Creditor Account, and shall make disbursements to claim holders, including with priority the holders of claims with a security interest in such rents, from that account.

To fund disbursements to claim holders under the Plan, the Debtor is to continue to operate its business and to lease space at the Real Property following the Confirmation Date,[1] and is to use net rental income to fund disbursements to claim holders under the Plan. The Debtor shall sell or refinance the Real Property, and net proceeds after payment of claims secured by the Real Property shall be used to pay in full all Allowed Claims secured by the Real Property and to fund distributions under the Plan, including to the holders of Class 4 Allowed Claims.

    *2.    The Debtor's Post-Confirmation Business*

The Debtor shall be authorized to maintain and conduct its normal business post-confirmation, including to borrow funds post-confirmation to fund disbursements under the Plan, without notice and without approval of the Court. After confirmation of the Plan, the Debtor shall be authorized to collect rents from tenants and to use ongoing income and rents as it deems necessary to meet its ongoing financial obligations and to make distributions under the Plan.

Debts incurred after confirmation and while the Plan and the Debtor's case are pending shall have priority over the debts affected by the Plan, as is necessary for the Debtor to continue normal operation of its business. Post-confirmation debt will be paid first and the provisions of the Plan are conditioned and coordinated upon such payment.

As of the Petition Date, the Debtor was a California corporation that had a single class of equity securities and had one shareholder. In accordance with § 1123(a)(6) of

---

1.  The "Confirmation Date" is the date of entry of the order confirming the Plan. Under the Plan, the "Effective Date" of the Plan is defined as that date fifteen days after the Confirmation Date, provided no stay of confirmation has been entered.

the Code, the Debtor shall be prohibited from issuing non-voting securities post-confirmation or any equity securities with preference over another class of equity securities with respect to dividends. If more than one class of equity securities is subsequently issued, the new class(es) shall have voting rights equal to those of the existing class.

### E.    Risk Factors.

The Plan is subject to certain risks. First, although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation, there can be no assurance that the Court will reach the same conclusion. Confirmation requirements and procedures are discussed below in Section VII and above in Section I.

Second, there is risk that the Debtor's tenant(s) will fail to pay monthly rent to the Debtor when it comes due. This would likely result in the Debtor's inability to meet ongoing expenses and any distributions that might come due at the time of a default by the tenant or tenants. Should a tenant default on rent and vacate its occupancy, this could significantly impair the Debtor's ability to sell or refinance the Real Property so as to complete distributions under the Plan. Because, however, the Debtor's tenants have considerable financial capacity, the Debtor believes that such risk is low.

Finally, there is risk that the Debtor will be unable to sell or refinance the Real Property to pay claims in full as required by the Plan. However, given the new lease with Fortune, the lease extension with the Council, and the additional leases with the County that the Debtor is pursuing, the Debtor believes that this risk is low. Specifically, the Debtor has inquired with various potential lenders, and has determined that because with essentially full occupancy the value of the Real Property significantly exceeds the amount of proceeds needed to fund the Plan, that refinancing will likely be obtained as required under the Plan. Alternatively, the Debtor believes that sale of the Real Property for an amount exceeding the amounts need to fund the Plan in full would be obtained before the date allowed claims must be fully paid under the Plan.

In the event of a material default in plan payments, creditors may seek conversion of the Case to chapter 7, in which event a trustee would be appointed to determine whether property, the Real Property in particular, can be sold for an amount in excess of costs and secured claims. In the event of default, creditors may also seek dismissal of the Case. If the Case were to be dismissed, creditors would be entitled to seek payment under contract and applicable state law, and the Debtor would have the option of seeking bankruptcy relief by way of another voluntary petition.

### F.    Executory Contracts and Unexpired Leases.

The Plan identifies any executory contracts and/or unexpired leases that are to be assumed under the Plan. "Assumption" means that the Estate has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults, if any, of the type that must be cured under the Code. The Plan also lists how

the Estate will cure and compensate the other party to such contract or lease for any such defaults, to the extent any such defaults exists and the contract or lease is assumed under the Plan.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

Except for executory contracts and unexpired leases already rejected or assumed by prior order of the Court, all executory contracts and unexpired leases that are not expressly assumed under the Plan will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases. If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

*The deadline for filing a proof of claim based on a claim arising from the rejection of a lease or contract by way of confirmation of the plan is thirty (30) days following the Effective Date of the Plan.* Any claim based on such rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

Any contract or lease that the Debtor may enter or may have entered after the Petition Date is not subject to assumption or rejection under the Plan.

**G.    Tax Consequences of Plan.**

*Creditors concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.*

The Debtor is aware of the following general tax consequences of the Plan. (1) The Debtor expects that confirmation of the Plan will not result in significant taxable income to the Estate during the year of confirmation. (2) Based on general understanding, the Debtor is informed that to the extent confirmation of the Plan results in the discharge of any debt owed to a hypothetical creditor and such debt qualifies as a business debt owed to such creditor, confirmation may create a federal tax deduction in favor of the creditor, subject to limitations under the Internal Revenue Code. Creditors, however, should consult with their tax professional to make any determination of the likely tax effects of confirmation of the Plan. (3) Distributions under the Plan may result in taxable income to creditors or other tax consequences. Creditors, however, should consult with their tax professional to make any determination of the likely tax effects of the receipt of plan distributions.

**H.    Objections to Claim.**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims after confirmation of

the Plan. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.

In general, no distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. The Debtor is to withhold disbursement of payment on any disputed claim by retaining the amount of funds such claimant would receive if the claim were allowed in full. Upon final determination of such dispute, the Debtor is to pay that claim amount allowed by the Court, pursuant to terms of the Plan. The Debtor will have the power and authority to settle and compromise any disputed claim subject to the notice and procedures set forth in the Plan.

Claims that are properly scheduled or timely filed as the case may be will be capped at the amount set forth in the schedules or proof of claim, as of the Confirmation Date. Except as may be specifically provided for under the Plan, no claim may thereafter be amended to increase the amount asserted.

As of this date, the Debtor has not identified any filed proof of claim that will be subject to objection.

## IV. LIQUIDATION ANALYSIS; FEASIBILITY

The following information is intended to assist creditors to understand how the Plan compares to liquidation of the Debtors' assets under chapter 7 of the Code.

### A.    Liquidation Analysis.

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders (if any) would receive in a chapter 7 liquidation. A liquidation analysis is submitted with this Disclosure Statement as Exhibit "E."

The Plan in effect provides that the Debtor will continued to operate its business, collect rents from tenants, and pay ongoing expenses associated with the Real Property, and net proceeds from operations will be used to pay claims under the Plan, and also the Debtor will sell or refinance the Real Property so that all allowed claims, including those of creditors holding liens against the Real Property, in full, no later than October 2017.

The Debtor asserts that because the Plan provides for full payment of claims with interest, without the additional layer of administrative costs and delay that would be involved after conversion to a chapter 7 case, that the Plan is a positive alternative to conversion.

/ / /

**B.    Feasibility.**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.  In this case, the Debtor asserts that this requirement is met, because the Debtor will be required in short order to sell or refinance the Real Property so as to pay all claims in full with interest, in which case no further liquidation would be necessary.

*1.    Ability to Initially Fund Plan.*

The Debtor projects that it will have sufficient cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  As noted above, Administrative Expense claims are payable on the Effective Date or upon court approval thereafter, and no such claims are anticipated to be payable until after court approval is obtained after the Effective Date.

*2.    Ability to Make Future Plan Payments And Operate Without Further Reorganization.*

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments.  Because net funds will be available as rents are collected from the Debtor's financially-capable tenants, and ongoing expenses will be paid as they are incurred, the Debtor believes that this requirement is met.  Exhibit "F" hereto consists of a Cash Flow Projection that was prepared by Mr. Schexnydre, covering the time period for distributions to secured claim holders under the Plan.  The figures therein are based on the Debtor's knowledge of its past operating expenses and the past expenses associated specifically with maintenance of the Real Property, the Debtor's past, present, and anticipated rental income, and Mr. Schexnydre's experience in management of the Debtor's operations.

**V.  NON-IMPAIRED CLASSES**

Pursuant to § 1123(a) of the Code, the Debtor specifies that Class 1, Class 3.1, Class 3.3, and Class 5 claims or interests are not impaired under the Plan.  The Plan impairs the following classes of claim or interest:  Class 2.1, Class 2.2, Class 3.2, Class 3.4, and Class 4.

**VI.  CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmed, the Plan must meet the requirements listed in § 1129(a) or § 1129(b) of the Code.  These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept

the Plan; and the Plan must be feasible.  These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### A.    Who May Vote or Object.

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.  Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (i) allowed or allowed for voting purposes and (ii) impaired.

In this case, the Debtor believes that certain classes are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Debtor also believes that certain classes are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 1.    What Is an Allowed Claim or an Allowed Equity Interest?

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (i) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim or equity interest, an no objection has been filed to such proof of claim or equity interest.

When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Federal Rule of Bankruptcy Procedure 3018(a).

Except as specifically provided otherwise in the Plan, the deadline for filing a proof of claim in the Case was October 15, 2014 for non-governmental claimants, and December 15, 2014 for governmental claimants.

### 2.    What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

/ / /

3.    *Who is **Not** Entitled to Vote to Accept or Reject the Plan.*

The holders of the following five types of claims and equity interests are *not* entitled to vote to accept or reject the Plan:

/ / /

- Holders of claims and equity interests that have been disallowed by an order of the Court;
- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- Holders of claims or equity interests in unimpaired classes;
- Holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and
- Holders of claims or equity interests in classes that do not receive or retain any value under the Plan;
- Holders of claims for administrative expenses.

***Even if you are not entitled to vote on the Plan, you have a right to object to confirmation of the Plan and to the adequacy of the Disclosure Statement.***

4.    *Who Can Vote in More Than One Class.*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and can cast a ballot for each claim.

**B.    Votes Necessary to Confirm the Plan.**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below in Section B.2.

1.    *Votes Necessary for a Class to Accept the Plan.*

A class of claims accepts the Plan if both of the following occur: (i) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (ii) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of impaired equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.    *Treatment of Nonaccepting Classes.*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code.  A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

## VII.    EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge of the Debtor.

Upon confirmation of the Plan, the Debtor will be fully discharged from any and all obligations owed to any creditor prior to confirmation, and title and ownership to any and all property of the Estate will vest in the Debtor free and clear of any lien and/or encumbrance of any creditor other than as specifically provided for through the Plan.

The Debtor will remain in possession, control, and management of its business after confirmation of the Plan.

### B.    Modification of Plan.

The Debtor may modify the Plan at any time before confirmation of the Plan. However, in such an event the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (i) the Plan has not been substantially consummated and (ii) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree.

The Debtor or other party in interest is authorized to request an order administratively closing the bankruptcy case under § 350(a) of the Code, subject to being reopened on the motion of any party in interest, to determine any issue, claim, objection to claim, or right under the Plan, or for other cause as set forth in § 350(b) of the Code.  Even should disbursements under the Plan remain to be made at the time a request is made to close the Case, the Court may determine the Case fully administered / / /

under § 350(a) of the Code and therefore may close the Case, so long as there is good cause for the closing of the Case, such as to avoid unnecessary administrative expense.

### VIII.  OTHER PLAN PROVISIONS

The Plan includes provisions regarding the filing of post-confirmation reports, post-confirmation liquidation of assets, retention of jurisdiction by the Court, Plan default.  Under the default provisions, if the there are defaults in the payments as required by the Plan, creditors and parties in interest are entitled to move for conversion of the case to a case under chapter 7 of the Code, for cause, or dismissal of the case. Creditors should read those provisions in the Plan, and all other provisions of the Plan, before deciding how to vote on the Plan.

Dated: 11-9-15

CALIFORNIA COMMUNITY
COLLABORATIVE, INC.


By: _Merrell Schexnydre_
Merrell Schexnydre
Its president


Dated: Nov. 9, 2015

MEEGAN, HANSCHU & KASSENBROCK


By: _____
Anthony Asebedo
Attorneys for the Debtor

aa:\mhk-14 disclosure statement_a4 0326